Good morning, Your Honors. May it please the Court, my name is Dirk Juhlander. I represent the appellant, D. Bello and Associates, as well as the respondents, D. Bello and Associates, Jeff Bates and Mr. Dunn Bello. With the Court's permission, I'd like to reserve five minutes for rebuttal. All right. Try to watch your clock. You've got it. Your Honors, this case isn't as exciting as Hawaii Five-0 and government regulations. We're back to breach of contract and some business torts. I beg the Court's patience with me as I try to work through some of these issues. Actually, it's very interesting. Okay. Well, in fact, Your Honor, we do have an unusual situation here. I call these cases business divorce. And oftentimes, the emotion that ranges with the parties is really typical of even a family divorce, it seems. And that's what we had here. Twenty years is longer than most marriages, I guess. It is, isn't it, Your Honor? And in fact, these parties got along really well, and over that 20 years, they developed what I would call a book of business. And I think this is really important. It's critical even to the HDP, or the Honolulu Data Entry Appeal. And that is, the relationship between these parties, Diebell & Associates and HDP, was not one of employer-employee. There's not a principal-agent situation here, or a contractor, independent-contractor situation. These parties were equal in their contractual relationship with their clients, the title insurance industry people. There was no contract between them and no partnership agreement or anything like that, at least at the beginning. That's true. There was never a written memorandum of the overall relationship of the parties. That's absolutely true. Of course, later on, the parties documented one aspect of the relationship, and that is in the payment. It's called commissions. And I believe we dealt with this sufficiently in the brief, but I think it's important to underscore. Again, relating to the relationship of the parties. Commissions is a word that was probably not the best choice back in 2005, when they started using that word. Because commissions imply an employee-employer relationship, or a principal-agency relationship, which we did not have here. Rather, we had two parties, both on the contracts with the customers, so with equal rights to the revenue from those contracts. For example, just by way of example in how important this is, if one of the parties, HDP, for example, had committed a critical error that caused liability, Deepellow Associates was just as much with potential liability as HDP, because they are a contractor on the contract and would have been sued. They would have had the same liability. That's not the situation where you have employer-employee or other types of relationships. So, in this case, we have two parties with equal rights in the joint contracts. This book, this corroborative agreement, I think the court called it a collaborative agreement, allowed the parties to create a book of business, a very valuable book of business, because it generated millions of dollars over the 20 years. Acknowledge, there's no question, that HDP had a different financial interest in the book of business, 85% versus 15%, but the book of business itself was owned jointly between the two parties. Now, when HDP, the principal, Mr. Nath, pushed that button on that email, terminating the agreement, essentially what he did by eliminating the revenue sharing between these parties, he essentially usurped or took the book of business, the 15% ownership that DB had. He took it away from Deepellow Associates and took it to himself. That happened when he terminated the agreement, that happened when? That happened on August 22, 2012. From that day forward, he stopped paying the revenue split between the parties. So he took, for himself, DB, Deepellow Associates' 15% interest in the book of business. It was that simple. So, with that 15% interest gone, he has essentially, HDP, has excluded Deepellow Associates from the business. And at trial, HDP sought to show that Deepellow Associates was in breach of the oral agreement. The principal issue there was project management. You know, we had an 11-day trial here, so there's extensive testimony, and each side came out with something, you know, maybe not happily. But with respect to your client, where did the district court go wrong, in your view? Absolutely. I appreciate that, Your Honor. The district court went wrong in two very specific facts. The partial settlement agreement was a document that was created during litigation. It's very carefully crafted, and it's very carefully crafted as a shield and not a sword. The specific language of that agreement indicates that the partial settlement agreement can only be admitted into evidence, it's admissible only as a defense. That's directly from the language of the agreement. The district court found that somewhere in the language of the partial settlement agreement was an implied non-competition clause. But non-competition and the way the district court read the partial settlement agreement would be using that document as a sword and not a shield. The document itself has very express language expressing the intent of the parties, that it's a shield and not a sword. Now, the district court read into it some language that is completely inconsistent with the party's intentions under the document itself. On the claim that HDP has, I believe it's their third count for breach of contract of the partial settlement agreement, the district court misinterpreted the contract itself. But past that, HDP also left the district court with a problem. HDP had failed to produce any discovery relating to their damages in this case until the third day of trial. And when Devell and Associates objected to the evidence that HDP was seeking to admit on damages, the court sanctioned HDP and said, we're going to stop any further admission of evidence on that subject. And so consequently, HDP was not able to and did not produce any evidence of their costs, their avoidable costs associated with the work that they were doing. So that left the district court with a problem. It found that Devell and Associates had breached the partial settlement agreement with respect to one contract, the North Dakota guarantee and title contract. And it found that Devell and Associates would have to pay 85% back to HDP. It is unequivocal in terms of, in fact, the district court acknowledged the penalizing nature of his decision in awarding 85% of the contract cost in the court's original findings of fact. In the amendments of findings of fact. It's 85% of the gross revenue. That's correct, 85% of the gross revenue. But is that in accord with their original understanding of how they were going to divide things up? Absolutely. The revenue split was $15.85. But when you get to damages, that's no longer the question. The question isn't one of what was your gross revenue, 85%. The question is, what was your lost profits? And this was a lost profits claim, breach of contract. We should have gotten the policy work for North Dakota title. We didn't get it, so we're entitled to recover our lost profits. Which would have been 85% of the gross revenues less some costs. Exactly. And so your argument is that not factoring in the avoidable costs is the legal error with respect to calculation of lost profits. That's exactly right, Your Honor. Francis Lee teaches that contract damages cannot be punitive. That's a very, I believe, a very settled area. Would you just circle back around then that I thought you said at the beginning or somewhere toward the beginning of your argument that the reason the costs and other information wasn't put in was because of a discovery ruling or a sanction? Yes, Your Honor. It's sort of like this conundrum, and I'm trying to understand it. I don't know what HDP would have put into evidence had the court not sanctioned them. The court sanctioned on, I believe it was the third day of trial, when they finally produced their evidence of damages in discovery, the court's ruling was, I'm going to stop and not let you introduce any more damage evidence. So they had Mr. Nath that testified. They had some documents that Mr. Nath had put into evidence. None of those, neither the testimony nor any of the documents that were put into evidence, identified the avoidable costs. What it would have cost HDP to do the production under that. And you're saying that they couldn't put in any more because the district court precluded? Two things. Number one, the district court precluded them from introducing any further evidence on the issue of damages as a discovery sanction. Number two, that they had not produced anything in discovery, and they actually produced nothing up to that point in time on the avoidable costs for the work that they were doing. That's just simply nowhere in the record. And so as a result, when the district court wanted to rule in their favor on this breach of partial settlement agreement, the court didn't have what it needed in order to award lost profits. What's the remedy, if you're right? Absolutely. The remedy is really simple. It's in OMURA. The OMURA versus American River Investors tells us that the remedy is nominal damages. I believe that, first of all, the third count for breach of partial settlement agreement just simply should never have been found against my client. I understand that. But past that, OMURA teaches us that if you're going to find that there was a breach of the partial settlement agreement, the remedy is nominal damages, $1, $10. I don't know what that would be, but nominal damages. And in this case, the district court awarded 85% of the revenue, which I can tell the court was over $100,000 that's actually been paid to HDP up to this point in time. So it was certainly nothing like nominal. I believe in the record at the time the briefs were filed, the number was estimated to be $57,000. That number is updated with the actual payment of over $102,000. Why wouldn't the remedy, if you're correct, be to go back, a remand to the district court, leaving it at 85%, which was what the agreement said, but making any appropriate adjustments? Because there is no evidence in the record, nor can there be, because of the district court's order on sanctions. Right, but it's like that doesn't mean that if it's wrong, that the district court couldn't open testimony as to what were the costs. Well, the district court could change the ruling on its ruling, because the court said, look, you, as a penalty for failing to introduce or to produce your damage evidence during discovery, I'm going to not allow you to introduce any more evidence on this subject at trial. That's the ruling of the court. Are you objecting to that as a sanction? No, I think it was perfectly appropriate. I'm happy with that. Absolutely, absolutely, and all I'm saying is that on remand, the court would have to reverse that ruling to allow in further evidence of sanctions. That was what was being suggested. That's what I was asking. Let's just say that you look at this and you say, well, it was an error to award gross revenues because of normal lost profits calculations. It's remanded to the district court to determine the appropriate breach of contract damages, which would include appropriate adjustments, reductions based on costs. Then the district court could do that, right? The district court could do that based on the evidence that's already in the record. Well, or the district court could say, on this point only, we'll take evidence as to what the appropriate reductions are. Well, to be clear, and again, it's not Monday. I can't have that. You want $1 damage. Yes, precisely. You don't want it to go back to the district court and find out what 85% minus X is, right? That's true because you can't figure out X. Your theory is that having sanctioned them, now they have to take the whole sanction, which is that they can't recover anything. Otherwise, the sanction means nothing. I mean, that was the point of the sanction, and that's the point of their discovery abuse, the third day of trial. But there is some odd inconsistency if the district court is sanctioning them but then gives them the prize, so to speak, the full 85%, right? Sure. So there's some inconsistency there. Would you want to save the remaining time? I would, Your Honor. That's fine. Thank you very much. Good morning. May it please the Court. I'm Michael Marsh. I represent HDEP, the plaintiff, Papali, and Cross Appellant. I'm splitting my time today with co-counsel, Mr. Terence O'Toole. We're going to divide it 10 minutes, 10 minutes. I'd like to reserve two minutes for rebuttal. Also, you have a very nice, soft voice. I'm sorry, Your Honor. I'll pick up the microphone and speak more loudly. Thank you. My apologies. You have 20 minutes total time, so why don't you just split it 10 and 10. Very good. All right? Okay. So in Mr. Juhlander's arguments, I'm addressing the issues of commissions and denial of the award of attorney's fees. Mr. O'Toole will address the other issues relating to defamation, et cetera. Are you addressing the 85% issue? No, Mr. O'Toole will address that, Your Honor. So I'm just on the award of commissions in favor of DBA and on the denial of attorney's fees to DBA. So with regard to the commissions, Mr. Juhlander began an argument that the parties have joint contracts, and this is developed also in his answering brief. However, what I wanted to point out for the court is that, contrary to the assertions in DBA's brief, the court made no finding and no conclusion that DBA was entitled to directly receive revenues under the joint contracts. What the court concluded is that the division of revenues between HDEP and DBA was controlled solely by the agreements between the companies themselves. And it also found and concluded that the obligations of HDEP include payment of commissions as specified in the 2012 commission agreement. Neither DBA nor HDEP appealed the court's determination that the division of revenues was controlled solely by the agreements between the companies themselves. That is the controlling point on this issue. And so it brings you automatically back to what is the proper method of interpreting the agreement of the party, and did the court make the proper findings. I would also point out that if there's absolutely no legal reason, DBA cited no law, and there's absolutely no legal reason why two parties in that situation cannot, between themselves, agree to anything they want to agree to with regard to what rights and responsibilities they share under those contracts. That's basically what they did. They had their own separate agreement, who does what, who gets paid what. They entered into an oral agreement. By the very nature of that oral agreement, they subjected all of their rights to an at-will termination at any time. If they wanted a different agreement, they should have made a different agreement. That's not what they did. And it's really not the place of the court, as you understand, to rewrite the agreement to more generously benefit DBA than what the party's own agreement provided. So going back to the issue of what did the agreement of the parties provide, this is where we disagree with the district court. We disagree, and I think the way to analyze it is in two steps. The first step is under the oral agreement itself, disregarding the commission agreements, was there any reason to believe that the parties intended that following termination of this at-will arrangement, DBA would continue to receive commissions? And I think there's a clear answer of no there. There's no facts to support that. The parties never discussed the question, and the district court made no finding or conclusion that the terms of the oral agreement itself required payment of commissions post-termination. The only way the district court got to that conclusion was through the 2012 commission agreement. So it's completely a question of interpreting that 2012 commission agreement. Was that the agreement that was supposed to be impartial settlement of the whole dispute that was in court? No, Your Honor. Explain the difference. It's referred to as a commission agreement, but it's actually not an agreement or a contract. It's a partial writing of the agreement between the parties. Most of the agreement between the parties was oral. But in 2005, they reduced a part of their agreement to writing. Now I'm confused. I thought you were referring to a 2012 agreement. Yes. They did it first in 2005, and then they did it in 2012 again. Now they didn't change the terms at all in 2012. The 2012 commission agreement reads exactly like the 2005 commission agreement. All they did was change the exhibit that's attached, because the exhibit provided an updated list of the existing contracts under which HDEP was already paying commissions to DBA. So it really, and in fact, it's one of the reasons why I think the district court made a clear error of fact, because I think what the district court held. Can you point us to the district court's finding that you're challenging? Yes, I can. Thank you. Thank you. The district, it's there. It's in the supplemental record at 2627. There are two, and on pages 26 and 27 of the amended findings of fact and conclusions of law, there are two separate things. First of all, the district court found that although, and I'm quoting here, although it did not supplant the oral agreement, end quote, the 2012 agreement, quote, imposed the specific obligation that HDEP pay commissions to DBA, end quote, under the agreement, and then proceeded to hold that termination didn't relieve HDEP of that obligation. But you're reading where? This is in the findings of fact and conclusions of law, pages 26 and 27. This is the amended findings? Yes. All right. Thank you. Both parties agree that a valid oral contract existed. Parties 212 commission agreement, though it did not supplant the oral agreement, imposed the specific obligation that HDEP pay commissions to DBA as specified in the attached list of the joint contracts. Right. That's the first one where he basically says it didn't replace, but it imposed this obligation. And then the second finding, continuing a little further down, is that these commissions were bargained for and paid in recognition of DBA's sales and marketing efforts in establishing various accounts, as well as some level of ongoing work for the accounts. So I think the only way to read those two things. Where is that? In paragraph? Let's see. These commissions were bargained for and paid for? Okay. Right. Yes, it's the second to last paragraph on page 26. So when you read those two findings together, the only conclusion you can reach is that the district court determined that the 2012 commission agreement essentially amended the oral agreement between the parties to convert this from a situation where ongoing services are provided in exchange for payment of ongoing commissions into one in which future commissions are going to be paid in reward for past service. That's essentially what the court is saying here. These commissions were bargained for and paid in recognition of DBA's sales and marketing efforts in establishing the various accounts. There's no evidence that there was any intent to amend the parties' oral agreement in that regard. The only evidence when this updated commission agreement was presented, the only thing that Mr. Bellow said about this was that this was a housekeeping matter in order to update the list of contracts. And Mr. Knopf, on behalf of HDEP's response, was he would sign it because it was identical to the 2005 agreement. That's the extent of the discussion between the parties, and you can't take that discussion and correctly reach a determination that now for the first time an agreement which had been an at-will, continuing service, continuing payment of commission agreements is turned into one in which the commissions have become an annuity that are going to go on in perpetuity or at least until the customer contracts expire. There's just absolutely no evidence to support that. Is the $1.2 million awarded flow solely from those ongoing commissions? Absolutely, Your Honor. Your time has expired. You may want to cede to your colleague. Thank you, Your Honor. Thank you. Good morning, Your Honors. I'm Terry O'Toole, and I've got the other 10 minutes of HDEP's argument. With the Court's permission, I would be the one to respond to the argument that was made having to do with the NDGT contract, the 85%, and hopefully with time permitting, I'd like to turn to what I thought was an interesting issue in the case, and that's the issue of defamation, and that is an issue where we think the Court gave it not only short shrift, but there was error in terms of the Court's decision. Let me turn to the argument that was made by opposing counsel about the breach of what's been referred to as the partial settlement agreement. The record is absolutely clear that this agreement, which was entered into between the parties after the litigation was filed, was intended to do several things. Where was that? The partial settlement agreement was signed. It's referred to as the December 19, 2012. It was not described as a sword or a shield.  And the core principle here is you don't go and poach the other guy with existing business. The agreement is absolutely clear on its face that you don't go after an existing client or an existing business. NDGT, North Dakota Guarantee and Title, was an existing client. It was an existing business. There's ample testimony and exhibits on what that was. And the Court found that it was a breach, absolutely a per se breach of that agreement. There was no confusion. And that it was also a collateral breach of the North Dakota and Guarantee Agreement because it required that the, quote, title team provide the exclusive services to that particular client. So I won't take more time on that. I think the record is clear. Now there's been, obviously, questions from the Court and arguments by counsel that the 85% is a product of an unfair award that somehow connects with a sanction. There was no sanction, Your Honor, Your Honors. The record's clear. What happened here is that we submitted evidence on the totality of HDEP's damages as a result of what we characterize as just wholesale interference with client relations. It wasn't on this particular client. And we put in our evidence and Judge Curran determined that some of it was new enough that they gave the opposing counsel time to rebut. The opposing party had the opportunity to have their expert look at that data. We never were precluded from putting in evidence about what were the costs to produce the NDGT work. So that's just totally wrong. But turning to the issue of was this calculation right, and I would submit to the Court it was and for these reasons. This business was taken secretly by DBA, unknown to our side, until well after the fact, and they performed the work for, they meaning DBA, performed the work for North Dakota. When the judge made the award of the 85%, there was still an existing ongoing contract with NDGT. And in the Court's decision, Judge Curran specifically said at page 33, should DBA not want to continue doing the work and let HDEP perform the work and we're actually the people that do the work, we do the abstracting, they can do that. Well, they didn't. So there's nothing unfair, there was no sanction, there's nothing here that somehow created some inequity. The facts here in terms of the equities were litigation was filed, partial settlement agreements were signed to try to stop this kind of stuff, they breached it and they got punished. And we think the measure is one reviewable under clearly erroneous and that it's absolutely appropriate here because how does one unring the bell when they perform the work? It boils down to if we agree with you that there was a breach of contract, then we look at what is normal standard for breach of contract damages and that's basically compensation commensurate with loss under Hawaii law, which is pretty typical. And is the actual loss 85%? How can it be 85% when, in fact, if you were the one normally performing that, it would be 85% minus X, whatever X might be. That's true. So why should 85% be sustained? Because, Your Honor, after the fact to try to go back and reconstruct, part of the work was already done by DBA. The future part of the work wasn't done, so that could have been handed off and it could have been done by HDEP, and they chose not to do that, they being DBA. And I think when you look at how do we try to reconstruct our damages at trial, we had simply invoices from a third party who was not a very willing witness at trial, and so that was basically what the court went with. That doesn't really make a lot of sense to me because when you have a damages claim and you say, well, I'm going to have either a damages expert or I get an accountant to say, based on looking at records before and the cost of time and other cost of services, this is a rough, fair estimate of what would be deducted. So my concern here is we don't really – I hear your rationale of why it went down this way, but I can't quite glean that from the findings of fact. I understand, Your Honor. I think if I could, because I will run out of time and I want to be responsive, I would leave it that we think that the record explains why the judge did what he did given the circumstances. We did put on damages as to the totality of what we thought we were damaged as a result of the interference across the entire client base, and I think there was enough there. But with your permission, I don't have more to add on that. Would I be allowed to address defamation? Because I'm afraid I'm going to run myself right out of time talking about this 85%. I agree with the court's point. I think this is an interesting case. The defamation claim was dismissed by the court with about a page and a half, with conclusory statements that there were opinions, and it focuses on what we refer to as the May 31, 2013 letter that was sent to all clients. And since I have limited time and since we briefed it, I would like to just hit a couple of the high points. It is a de novo review. We think the beginning and the ending place where the court didn't go is Milkovich, which then this court back in 1990 set forth a three-part test in Unelco in terms of looking at exactly these kind of publications. And the trial court did not go through any of that. Judge Curran concluded that what was set forth in this letter, which we consider to be horribly damaging, went to every single client, was opinion. There's no effort to go through the threshold analysis about whether what is stated here is, in fact, not opinion, or even if it is opinion, it's no longer a bright-line test to call it opinion and it's not actionable. What has been said here is that it's a letter from what they describe as the partner team. So it comes, unlike many of the cases, including Partington, where you've got somebody looking at how the case was tried. Bugliosi wrote his book and commented on what went down in the trial. Here we've got an insider, quote, partner. They describe this as a partner who is writing to every client. And this letter was moving forward in terms of six months' worth of preparation. It was part and parcel of taking business from HDEP, talking to other customers about how to get business away. There's admissions in their record that this was all part of a pattern of conduct to snag business while these parties had signed a partial settlement agreement and they were in litigation. And the things that they said, which go to the heart of a title business, is that this part of the partnership, which it's not a partnership, but they described it as such, couldn't shoot straight. They committed errors, which they described as gravely concerning. And my associate had a really good metaphor for that. This is like going to a doctor and having a doctor say, I found a lump. Now, we could all say that could be so what or it could be whatever. If the doctor follows up by saying, I found a lump and I'm very concerned or gravely concerned, it puts a totally different cast on it. So this is information coming from the inside that is absolutely objective. It's not hyperbole, and it is measurable. We know when we look to the record, there weren't errors. In fact, why this came up is that part of the pattern of conduct by DBA was to go to customers two months before the letter went out and ask them, do you have any errors? And they didn't find any. What they found is, and what they complained about, was one customer where they claimed there was lack of quality control. The quality control was to be done by DBA, not HDEP. Another customer said no errors, and then the last one was a few errors. Out of 50,000 transactions a day, it's normal to have a few errors. The point of it is the letter is replete with statements that are objective. They talk about cutting off all communications to them by HDEP. We have an admission by one of the key witnesses for DBA that that was not accurate. So I would simply submit, because I know I'm out of time at this point, that this issue got no attention by the court. It certainly didn't get through the threshold analysis, and I think absolutely it's an important determination. We tried to find if there was more Ninth Circuit law that would flesh this out. I think it's an important decision. We believe that we did actually submit proof of damages in terms of dropped business because of this letter, because of other conduct like it dealing with the customer base. In essence, HDEP played fair. DBA did not play fair, and the consequences were significant damages to our side. Thank you very much for allowing me to go over. You're welcome. You have a little bit of time left. Thank you very much, Your Honor. I appreciate your patience with me. I wanted to first address Mr. Marsh's comments with respect to the oral contract itself and the effect of the 2012 commission agreement on that oral contract, which divides the revenues between the parties. The principal argument that HDEP is making is it's an oral contract. It's terminable at will. What the trial court found, and it's a finding that should be sustained by this court, is that the 2012 commission agreement stays within it a term of duration. That's what the court found. The court went to great efforts to delineate the terms of duration of the written contracts versus the oral customer contracts and how that all worked. When we look at, and this is from the excerpts of record, Trial Exhibit 190, it's page 871, is the January 12, 2012 commission agreement. It says that HDEP will be paying DBA commissions and continue to pay, I'm quoting now, continue to pay such commissions for the duration of such contracts, including all renewals. The court found that was the duration of the parties' agreement. And based on that, the court ordered HDEP to account for the revenues under those joint contracts very specifically according to the duration of those contracts, even including the oral customer contracts. I'd like to address the, with respect to the partial settlement agreement, and back to that issue very, very briefly. Mr. O'Toole described that they were never precluded from introducing evidence of damages, but he didn't tell you what evidence of damages he actually introduced as to their avoidable costs. What did it cost HDEP to do the work? That was never put into the record, and that's why the court reached for the 85-15 split, which was acknowledged as being a penalty in violation of Hawaii law. It seems like the most appropriate remedy is this is an issue for nominal damages and the matter should just be reversed and directed that a judgment be entered for nominal damages on that count 3 for breach of the partial settlement agreement. Is that because they didn't put in the evidence? I couldn't find anything in here referring to a sanction expressly, so I'm a little confused as to just it seemed fairly fair for the district court in the absence of anything else to say, okay, there was a wrong, and so we're going to split it this way. Sure, as long as it's not penalizing a party, split it whatever way you want, but this becomes a penalty because the amount of the damage substantially exceeds what their profits would have been. If 85 percent is their gross revenue and they're doing all of the work, that can't be their loss of profits. It's not possible. Now, Mr. Nath testified at trial that overall they had a 50 percent profit margin, but that doesn't help either because you've got to get to what was the actual cost of production and the lost profits come from the cost of production. That was never put into evidence at trial, and so to do a do-over on this, it seems to me would be unfair to my client who has done everything exactly right according to the rules of evidence, and we participated in the trial, and this should have been ---- What is the ruling the district court made that was wrong on this? The ruling, Your Honor, and it's the ruling was that DBA pay to HDP 85 percent of the revenues on the North Dakota policy. Right, but where is it that he rejected the argument that they didn't put in the evidence of profit? The court didn't put that in the findings of fact. I'm deducing that the court had no choice because there was no evidence in the record as to the avoidable costs. And that was because the court precluded that evidence. Is that right? That's correct. Well, where is that ruling? I apologize, Your Honor. That's in the trial transcript. Okay. Why don't you do this because why don't you send us a 28-J letter that gives us the citation of that? I'd be happy to do that, Your Honor. And then I have another question about the defamation claim. Yes, please. Particularly the statement in the letter that says we have learned from certain clients that errors in the reported data from HDEP have occurred. Why isn't that a statement of fact that could be verified one way or the other as opposed to puffery or opinion? It can and it was. And what the trial court found, which is subject to clear error review, is that that statement was true. That indeed there were clear errors or there were critical errors that were found. In fact, the problem with the entire defamation argument that you've heard in the briefs and that you've heard on oral argument is they skip the issue of falsity. Right? The test is false and defamatory. They skip false. They go straight to defamatory. The court found that specific claim was indeed true. In fact, the court says similarly, and I'm on page 36, it's the excerpt of record page 91, similarly there was evidence of some errors and DBA's expression of great concern is again only opinion. So the truth was there was errors. Thank you. Thank you, Your Honor, very much. All counsel for your argument. It is a very interesting and lengthy case in terms of the record. And so we appreciate your illumination on all sides. The case of Honolulu data entry versus DiBello and Associates is submitted and we're adjourned.
judges: Schroeder, D.W. Nelson, McKeown